Joseph CARROLL, Charles Peterson and Charles Turecamo, as Treasurer, Orchestra Leaders of Greater New York, Plaintiffs,

v.

ASSOCIATED MUSICIANS OF GREATER NEW YORK and Al Manuti, as President, Max L. Arons, as Secretary and Hi Jaffe, as Treasurer of Local 802, Associated Musicians of Greater New York, Defendants.

United States District Court
S. D. New York.
April 18, 1960.

Schmidt & McDonald, New York City, for plaintiffs.

Ashe & Rifkin, New York City, for defendants.

DIMOCK, District Judge.

Plaintiffs, orchestra leaders and members of Local 802, Associated Musicians of Greater New York (hereinafter Local 802), which is an affiliate of the American Federation of Musicians, move for a preliminary injunction against Local 802. The Local's membership includes both leaders of musical groups and non-leaders or "sidemen". Plaintiffs seek to prevent Local 802 from enforcing "Regulations For Local 802 Single Engagement Welfare Fund" published in the January 1960 issue of "Allegro", the official magazine of Local 802. These "Regulations" state that "Contributions of $1.00 per engagement per member, including the leader, must be paid as a surcharge by the purchaser of the music, through the leader into the Fund on all said single engagements played on or after April 1, 1960." Local 802 concedes that if the purchasers of the music do not make the $1 payments, the leaders will be responsible for the payments into the welfare fund just as they are responsible for payment of wages to their "sidemen". Plaintiffs contend that any attempt to enforce this "Regulation" by Local 802 against plaintiffs as leaders would violate section 101(a) (3) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 411(a) (3), section 302 of the Labor Management Relations Act, as amended, 29 U.S.C. § 186, the federal anti-trust laws, and contracts between Local 802 and plaintiffs. Plaintiffs say

that this court has jurisdiction over their claims by virtue of the aforementioned federal statutes. Each one of these statutes applies only where some aspect of interstate commerce is involved.

Section 302(a) of the Labor Management Relations Act provides:

"It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce."

Plaintiffs argue that they are employers within the meaning of this section and that the requirement that they pay the surcharge into the Local's welfare fund violates the section.

Since section 302(e) of the Labor Management Relations Act, as amended, 29 U.S.C. § 186(e), gives this court jurisdiction to restrain violations of section 302, plaintiffs are entitled to succeed in this action if they can establish that the collection of the $1 surcharge would be a violation of that section.

■■■ The first question is whether the interstate commerce requirement of section 302 has been satisfied. Preliminarily on this issue it becomes important to know the nature of the activity to which the welfare plan applies. The plan, as its name indicates, applies to the "single engagement" musical field which is to be distinguished from the "steady engagement" field. In the "steady engagement" field there are many thousands of members of the Local under contract on a regular, full-time, basis to radio and television stations, legitimate theatres, hotels, restaurants, night clubs, shipping companies, the Metropolitan Opera, the New York Philharmonic Orchestra, etc. Musicians without such steady employment must depend on obtaining work as leaders or sidemen for "single engagements" such as weddings, bar-mitzvahs, debutante parties, college dances or similar jobs. The Union helps its members secure single engagements by providing an "Ex-change Floor" where members who have contracted with a purchaser of music to furnish an orchestra, and are thus leaders for the particular job, may seek out sidemen and sidemen may seek out leaders.

The jurisdiction of Local 802, by its Constitution, embraces New York City and Nassau and Suffolk Counties, New York. Frequently, however, the single engagements which plaintiffs, as leaders and members of Local 802, obtain call for performance outside New York State. The affidavit of plaintiff Carroll states:

"The class we represent gross literally millions of dollars from engagements outside of the State of New York and in various states of the United States."

The Local has nevertheless made it clear that the welfare plan is to apply to single engagements played in New York State only. Appearing on the first page of the March issue of "Allegro" was a notice entitled "Official Notice—Local 802—Single Engagement Welfare Fund —Essential Information for Members When Acting as Leaders" which contained the following prominently displayed paragraph:

"2. *Location of engagements* Applies to engagements played by an all-Local 802 band within the jurisdiction of Local 802 only. (New York City, and Nassau and Suffolk counties.)"

Upon this evidence I find that there has been a showing that Local 802 will not attempt to apply the disputed "Regulations For Local 802 Single Engagement Welfare Fund" to engagements played outside the State of New York. The question remains whether the "Regulations", though applying only to intrastate activities, would require payments by an employer to "any representative of any of his employees who are employed in an industry affecting commerce", so that section 302 would still apply. Arguably, the "industry" here is the whole "single engagement" music field in which Local 802 represents side-

men and their leaders. I doubt, however, that "industry" within the meaning of section 302 constitutionally could be construed thus broadly where the activities in dispute involve only a segment of this business. See National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 683, 71 S.Ct. 943, 95 L.Ed. 1284. I therefore shall treat the "industry" which must affect commerce for section 302 to apply as the "single engagement" field in New York City and Suffolk and Nassau Counties, New York.

It can no longer be argued, as the court did in Pappas v. American Guild of Variety Artists, D.C.N.D.Ill., 125 F. Supp. 343, at page 347, that the "entertainment and sports industries, by their very nature, are not part of interstate commerce". Since the date of that decision the Supreme Court has ruled that the anti-trust laws do apply to the entertainment world, United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279, and also to the sports world, Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456. But see Toolson v. New York Yankees, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64. It is also clear that Congress intended to exhaust its constitutional power over commerce in the Labor Management Relations Act. Guss v. Utah Labor Relations Board, 353 U.S. 1, 3, 77 S.Ct. 598, 609, 1 L.Ed.2d 601. Nevertheless, it seems clear that the actual performance of the engagements would be a purely local affair, just as the Supreme Court has indicated that the performance of legitimate stage attractions and the showing of motion pictures would be. United States v. Shubert, 348 U.S. 222, 227, 75 S.Ct. 277, 99 L.Ed. 279, supra; United States v. Crescent Amusement Co., 323 U.S. 173, 183, 65 S.Ct. 254, 89 L.Ed. 160. The fact that some of the single engagements are played for business establishments engaged in interstate commerce does not alter the situation. I fail to see how an interruption in the supply of music available to such a company for social affairs would have any recognizable effect on the flow of the company's interstate business. I am not dealing here with performances, such as operas by the Metropolitan Opera Company or concerts by the New York Philharmonic Orchestra, likely to be broadcast by radio or television to interstate audiences. These are in the category of "steady engagements" and indeed are covered by a separate union welfare plan which, the union admits, complies with the requirements of the Labor Management Relations Act.

Plaintiffs make the point, without contradiction by Local 802, that if they fail to comply with the "Regulations" they will be subject to intra-union reprisals, including boycott activities, which would prevent them from fulfilling engagements "in many hotels and other places; and their sidemen or employees would not be permitted to work for them". If these engagements were outside the state the dispute would then have a tendency to disrupt the flow of the services of the musicians across state lines. The only effect on the interstate side of the business that I can envisage would emanate from these reprisals which might be inflicted on members who refused to give in to the Local's demands. Since the plan is only now being put into effect, I can only speculate as to the scope of the reprisals and this very fact should perhaps preclude my finding interstate commerce involved at this time. I am of the opinion, however, that reprisals are likely and that even if they are directed only at local engagements, such for example as a boycott against all objecting leaders in their New York State engagements, the effects are bound to be felt in their substantial interstate business. Once a leader's name is placed on what would amount to a blacklist I seriously doubt that it would make much difference whether or not the Local made it clear to the membership that the leader was to be boycotted only as to New York State engagements. The blacklisted leader would most likely be shunned on the "Exchange Floor" by

most of the membership. Some members might be hostile because of the leader's opposition to the welfare plan and others might be afraid to be seen negotiating on the "Floor" with a blacklisted leader. I find, therefore, that there is a sufficient likelihood that the dispute will affect interstate commerce for the Labor Management Relations Act, section 302, to apply.

■ Local 802 does not argue that its welfare plan for the "single engagement" field complies with the requirements for a valid plan set out in section 302(c). It states rather that the plaintiffs, though leaders, are not "employers" within the meaning of section 101 (2) of the Labor Management Relations Act, 29 U.S.C. § 152(2), and, thus, that section 302 is not applicable. I cannot agree with this contention. Essentially the same argument was raised before the United States Court of Claims in Cutler v. United States, 180 F.Supp. 360, 362. That was a suit for the refund of Federal unemployment taxes paid pursuant to section 1600 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 1600. In holding the claimant bandleader to be an employer for purposes of the Code, the court, in a carefully reasoned opinion, said the following which is equally applicable to the case at bar:

"In this case, it seems obvious that the plaintiff, and not the purchasers of the music, was the employer of the musicians. The purchaser was interested in the leader, not in the individual musicians, except in rare instances. The leader had established a reputation of putting on good performances. Because of this he was employed not because of a certain man who played the violin or the trombone. What violinist or trombone player was to be employed was the leader's responsibility. The purchaser was interested only in the overall effect, in the montage, not the individual pictures. Plaintiff selected and employed the musicians and was responsible for the payment of their wages. It is true that occasionally a purchaser would request a particular musician, but in such instances it was still plaintiff who hired the musician. In all cases, the purchaser accepted the musicians sent by plaintiff and exercised no right to refuse their services.

"It was plaintiff, and not the purchasers who were in the business of providing music at social functions. The success of this business depended on plaintiff's ability and reputation as a musician. He is the one who bears the loss and gains the profit. This was not true of the purchasers who were merely buying the plaintiff's skilled services for a limited period. They had no pecuniary interest in the enterprise. Also, it is clear that the relationship between the plaintiff and the musicians was much more permanent than that between the purchasers and the musicians. In the latter instance, the relationship existed generally for one night, while in the former many of the musicians were used on other engagements performed by the plaintiff.

"Plaintiff contends, however, that all these factors are irrelevant because the purchasers had the contract right to exercise control over the musicians. It is well settled, however, that the words of contracts alone cannot shift tax liability fixed by statute. Bartels v. Birmingham, supra [332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947]; Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731. How the contract was actually performed, how the parties actually understood it and acted upon it, is a better guide to the true intent than the words, which are often used to conceal, not to convey, thought. There is no evidence that the purchasers of the music contributed, or had the power to contribute, musical skill or direction which would give them effective control over the mu-

sicians. The only control exercised by the purchasers concerned the type of music, its tempo, and the physical location of the musicians. This type of control pertains to the service to be rendered and does not give control over the method of rendering it. The method of rendering the music is a skilled art and cannot be controlled by an inexperienced layman. The fact that a house owner tells an independent house painter the color to paint his house does not make the painter the owner's employee. See Edwards v. United States, supra [Ct.Cl., 168 F.Supp. 955, decided Dec. 3, 1958]."

While the above quoted Cutler case dealt with a tax problem it is just as true in labor cases that the actual relations of the parties, not the words of their contracts, are controlling. Butler Bros. v. National Labor Relations Board, 7 Cir., 134 F.2d 981, certiorari denied 320 U.S. 789, 64 S.Ct. 203, 88 L.Ed. 475. It seems clear in this case as in the quoted case that plaintiffs are the employers and the musicians hired by them are their employees.

█ Local 802 argues further that this court should refrain from acting in the cause because plaintiffs have lodged a complaint against the Local with the National Labor Relations Board in the same dispute. In the pending Board proceedings plaintiffs have urged that the Local has been guilty of a "refusal-to-bargain" unfair labor practice, Labor Management Relations Act, § 8(b) (3), 29 U.S.C. § 158(b) (3), in putting the "Regulations" into effect without bargaining with the leaders.

I know of no rule which would warrant my staying this action pending a determination by the Board. It is true that some of the underlying issues before the Board and before this court, such as whether interstate commerce is affected and whether the leaders are "employers", may be the same, but the proceedings involve construction of different sections of the Labor Management Relations Act. The question before the Board is whether there has been a refusal to bargain. The question before me is whether there has been a violation of section 302(a). If the Board decides there was no refusal to bargain, for whatever reason, I would still have to decide whether there was a section 302(a) violation. If the Board decides that there was a refusal to bargain, the most that this would mean would be that a resolution of the section 302(a) question would become unnecessary. Under these circumstances, I decline to stay the action before me.

█ I find, upon the facts before me, that the plaintiffs have established a violation of the Labor Management Relations Act, § 302, and are entitled to a preliminary injunction.

█ Defendants cross-move for a dismissal of the complaint. My prior discussion makes it unnecessary to discuss most of the points raised on this motion by defendants. As for plaintiffs' claim based on a common-law contract theory, it is but a different ground asserted in support of the total claim that the welfare plan is invalid. Plaintiffs allege that the Constitution and By-Laws of the Local and of the American Federation of Musicians constitute contracts between the Local and its members, that the procedures contained therein for membership adoption of a welfare plan were not followed, and that any attempt to enforce the provisions of the plan would constitute a violation of these contracts. Since the total claim of invalidity is supported by valid federal question jurisdiction, no independent base of federal jurisdiction is needed for the federal court to deal with this non-federal ground. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148.

Plaintiffs' motion for a preliminary injunction is granted. Defendants' cross-motion to dismiss the complaint is denied.

Settle order on notice.